**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**SHELIA CLINE GIBSON,**

      **Plaintiff,**

**v.**                                                              **Case No.: 1:17-cv-03699**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

     This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 9, 10).

     For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **GRANTED**, to the extent that it requests remand of the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g);

1

**DENY** Defendant's request to affirm the decision of the Commissioner; **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.     Procedural History

On November 25, 2013, Plaintiff Shelia Cline Gibson ("Claimant"), filed an application for DIB, alleging a disability onset date of December 8, 2009, due to depression, narcolepsy, and fibromyalgia. (Tr. at 214-15, 241). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 109-11, 125-27). The SSA noted on reconsideration that Claimant additionally claimed disability due to chronic obstructive pulmonary disease, migraines, and a heart stent. (Tr. at 125). Claimant filed a request for an administrative hearing, which was held on January 12, 2016, before the Honorable Robert J. Burbank, Administrative Law Judge ("ALJ"). (Tr. at 35-54). By written decision dated February 9, 2016, the ALJ noted that Claimant previously filed a DIB application alleging the same onset date of December 8, 2009. (Tr. at 20). Therefore, pursuant to the doctrine of res judicata, the ALJ considered whether Claimant was disabled beginning on February 23, 2012, the date after the unfavorable decision on her prior DIB application, through December 31, 2014, Claimant's date last insured. (Tr. at 20, 29). The ALJ concluded that Claimant was not disabled as defined in the Social Security Act during the above period. (Tr. at 20-29). The ALJ's decision became the final decision of the Commissioner on May 25, 2017 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42

2

U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 7, 8). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 9, 10). Consequently, the matter is fully briefed and ripe for resolution.

## II.    Claimant's Background

Claimant was 52 years old on the date following the decision on her prior DIB application and 54 years old on her date last insured. (Tr. at 214). She has a high school diploma and communicates in English. (Tr. at 39, 240). Claimant previously worked as an office manager, phlebotomist, and receptionist. (Tr. at 242).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. § 404.1520(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe

impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2014. (Tr. at 22, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since December 8, 2009, her alleged onset date of

4

disability. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had a single severe impairment of narcolepsy. (Tr. at 22-24, Finding No. 3). The ALJ also considered Claimant's fibromyalgia, affective disorder, and anxiety disorder, but concluded that such impairments were non-severe. (Tr. at 23).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 24, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b).

(Tr. at 25-28, Finding No. 5).

At the fourth step, the ALJ found that Claimant was capable of performing her past relevant work as an office manager, phlebotomist, and receptionist. (Tr. at 28, Finding No. 6). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (*Id.*, Finding No. 7).

## IV.    **Claimant's Challenge to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. First, Claimant asserts that the ALJ did not consider whether she needed to sleep during the work day in assessing her RFC. (ECF No. 9 at 4). Claimant cites that she was diagnosed with narcolepsy and prescribed daytime naps as part of her treatment plan. (*Id.*). However, Claimant contends that the ALJ did not make any finding as to whether she needed to sleep during the day, which Claimant argues directly violated the mandates of *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015) and Social Security Ruling 96-8p, which both require an ALJ to perform a function-by-function analysis that is supported by specific references

to the record. (*Id.* at 4, 6). Claimant states that to the extent the ALJ found that Claimant did not need to sleep during the day, or needed to sleep less than she asserted, the ALJ did not articulate such a finding, nor did the ALJ cite evidence to support that conclusion. (*Id.* at 6). Claimant contends that the issue of whether she needed to sleep during the day was particularly critical to the ALJ's decision, because the vocational expert testified that it would preclude an individual from substantial gainful employment. (*Id.* at 5). In Claimant's second challenge to the Commissioner's decision, Claimant argues that the ALJ likewise did not consider her migraine headaches in assessing her RFC. (*Id.* at 9).

In response to Claimant's first challenge, the Commissioner asserts that the ALJ fully considered Claimant's allegations of fatigue, loss of concentration, and the need to take two naps totaling five hours of sleep per day, but the ALJ ultimately found that Claimant's allegations concerning the limiting effects of her narcolepsy were not fully credible for legally sufficient reasons. (ECF No. 10 at 13). According to the Commissioner, the ALJ considered all of the relevant evidence bearing on Claimant's narcolepsy and then expressed Claimant's limitations in terms of work-related functions. (*Id.* at 18). Therefore, the Commissioner argues that the ALJ's RFC finding was consistent with the applicable law. (*Id.*). As to Claimant's second challenge, the Commissioner contends that the ALJ's failure to discuss Claimant's headaches does not warrant remand, because Claimant did not adduce it as a reason that she could not work; medication was effective in controlling her headaches; and there was no evidence of functional limitations associated with Claimant's headaches that the ALJ failed to include in the RFC assessment. (*Id.* at 19).

## V.   **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The following

evidence is most relevant to the issues in dispute.

### A. Treatment Records

On December 29, 2009, Claimant's primary care provider referred Claimant to sleep medicine specialist, Charles E. Porterfield, D.O., due to her history of cataplexy, headache, and daytime sleepiness. (Tr. at 421). Dr. Porterfield conducted a Multiple Sleep Latency Test (MSLT) and concluded that Claimant's results were consistent with narcolepsy. (*Id.*). However, Dr. Porterfield stated that in order to make the diagnosis with certainty, Claimant would need to be studied following complete polysomnogram to rule out whether a sleep disorder was affecting the results. (*Id.*). Dr. Porterfield further explained that if Claimant's reported cataplexy was accurate, it improved the diagnostic certainty that Claimant had narcolepsy. (Tr. at 421-22). Dr. Porterfield studied Claimant by polysomnography the following month on January 14, 2010, but her results were normal. (Tr. at 423). Therefore, Dr. Porterfield repeated Claimant's MSLT, which he again found to be diagnostic of narcolepsy. (*Id.*).

On February 6, 2012, Claimant saw nurse practitioner, Jill Blake, under the supervision of Dr. Porterfield. Claimant reported that she still had some episodes of sleepiness and took Nuvigil[1] as tolerated. (Tr. at 368). On examination, Claimant was alert and oriented. (*Id.*). However, Ms. Blake noted that Claimant's MSLT showed narcolepsy. (Tr. at 369). Claimant was continued on Nuvigil and recorded that Xyrem[2] would

---

[1] "Nuvigil is a prescription medicine used to improve wakefulness in adults who are very sleepy due to one of the following diagnosed sleep disorders: narcolepsy, obstructive sleep apnea (OSA) [....and] shift work disorder (SWD)." https://www.fda.gov/downloads/Drugs/DrugSafety/UCM231717.pdf

[2] Xyrem "is a prescription medicine used to treat the following symptoms in people who fall asleep frequently during the day, often at unexpected times (narcolepsy): suddenly weak or paralyzed muscles when they feel strong emotions (cataplexy) [and] excessive daytime sleepiness (EDS) in people who have narcolepsy." https://www.xyrem.com/.

additionally be prescribed subject to insurance approval. (*Id.*).

The next day, Claimant saw family nurse practitioner, Kellie B. Vaught, in coordination with Barry K. Vaught, M.D. (Tr. at 341). Claimant was taking Topamax twice per day to prevent headaches. (*Id.*). Claimant averaged two headaches per month, which she described to be of a stereotypical nature and easily relieved with Tylenol or Advil. (*Id.*). Claimant was noted to be doing "very well" in general, but she was concerned about her memory. (*Id.*). Claimant stated that she was forgetting names, was unable to recall if she told her husband things, and was repeating herself frequently. (*Id.*). Claimant advised that her mother was recently diagnosed with Alzheimer's disease, and Claimant was worried that her own memory lapses were symptomatic of early Alzheimer's disease or related to her use of Topamax. (*Id.*). Claimant acknowledged that she was under a lot of stress caring for her mother and was also caring for her father, who recently had a stroke. (*Id.*). Claimant's neurological examination was normal, including her memory, concentration, and attention. (*Id.*). Claimant also received a "perfect score" of 30 out of 30 possible points on her Mini-Mental State Examination (MMSE).[3] (Tr. at 341-42). Ms. Vaught explained to Claimant that a higher dosage of Topamax could cause cognitive decline, and that the medication was the most likely cause of her reported memory lapses. (Tr. at 342). Ms. Vaught also explained that Claimant's stress over caring for her parents could also "play a big role" in her cognitive issues. (*Id.*). Claimant's diagnoses included, *inter alia*, headache, narcolepsy with cataplexy, and mild cognitive impairment. (*Id.*). Claimant's treatment plan was to taper off Topamax and start taking propanol for

---

[3] "The MMSE is a brief, quantitative measure of cognitive status in adults. It can be used to screen for cognitive impairment, to estimate the severity of cognitive impairment at a given point in time, to follow the course of cognitive changes in an individual over time, and to document an individual's response to treatment." https://www.parinc.com/products/pkey/237

prevention of headaches. (*Id.*).

Claimant presented to Ms. Blake and Dr. Porterfield for a follow-up appointment on June 4, 2012. Claimant reported that she discontinued Xyrem because it worsened her depression and changed her personality. (Tr. at 372). Claimant stated that she could sleep approximately 18 hours per day, especially when she did not take Nuvigil. (*Id.*). Claimant noted that she "did better" when she took Nuvigil, but reported that she still had to take naps every day. (*Id.*). Claimant was started on Ambien in place of Xyrem and was also prescribed the stimulant Concerta. (Tr. at 373).

Claimant followed up with Dr. Vaughn on June 7, 2012. Claimant reported that the medication change from Topamax to propanol did not improve her memory, but did cause significant worsening of her headaches. (Tr. at 343). Claimant stated that since she stopped Topamax, and in light of the increased stress at home, she was having one to two migraine headaches per week with sensitivity to light, sound, and smell, as well as difficulty with nausea and vomiting. (*Id.*). Claimant reported that Tylenol eased, but did not completely resolve, her headaches and she usually had to sleep to completely relieve the headaches. (*Id.*). Claimant continued to express extreme concern regarding her memory loss and related that she no longer drove due to narcolepsy. (*Id.*). Claimant's neurological examination was normal. She again received a perfect score on the MMSE. (Tr. at 343-44). Dr. Vaughn diagnosed Claimant with headache, narcolepsy with cataplexy, memory loss, and depression with anxiety. (Tr. at 344). Dr. Vaughn increased Claimant's dosage of Topamax and instructed her to continue using Tylenol as an abortive therapy. (*Id.*). Dr. Vaughn discussed prescribing Imitrex, which was noted to have been successful in treating Claimant's headaches in the past, but he decided not to do so in light of Claimant's cardiac history. (*Id.*). Dr. Vaught also increased Claimant's dosage of

9

Cymbalta for depression. (*Id.*). Finally, Dr. Vaughn opined that Claimant's memory difficulty was likely related to increased stress and anxiety; nonetheless, he referred her for neuropsychological testing to evaluate the issue. (*Id.*).

Claimant saw Ms. Blake again on August 23, 2012 in follow up of her narcolepsy. Claimant was noted to be "doing about her normal." (Tr. at 374). She was continued on Nuvigil and Ambien. (Tr. at 375). Claimant saw Dr. Vaught again the following month on September 10, 2012 and reported that the increased dosage of Topamax helped with the intensity, but not the frequency, of her headaches. (Tr. at 346). Claimant advised that she canceled her neuropsychological testing appointment because she found Cymbalta to be helpful in terms of her reported memory loss. (*Id.*). Claimant expressed continued difficulty with maintaining attention and concentration, which she blamed on depression. (*Id.*). She further reported that Dr. Porterfield instructed her to skip taking Nuvigil every sixth and seventh day, which Claimant claimed caused a great deal of problems for her. (*Id.*). Claimant stated that she would "sleep for those entire two days" that she did not take Nuvigil. (*Id.*). At this visit, Dr. Vaught again increased Claimant's dosage of Topamax in hope of reducing the frequency of her headaches, continued Claimant's current dosage of Cymbalta, and advised her to speak with Dr. Porterfield regarding her medications for narcolepsy. (Tr. at 347).

Claimant followed up with Ms. Huffman on November 8, 2012. Claimant stated that there was no change regarding her narcolepsy; she had "good days and bad days." (Tr. at 376). Thus, Claimant was continued on medications. (Tr. at 377). At Claimant's next visit with Dr. Vaught on January 23, 2013, Claimant was doing well in terms of her headaches and she had no further migraines since her prior visit in September. (Tr. at 348-49). She took Topamax twice daily and used Excedrin Migraine as an effective

abortive therapy. (*Id.*). Claimant continued to express issues with depression and anxiety, noting that her mother was receiving hospice end-of-life care for Alzheimer's disease, and Claimant had struggles with her siblings regarding her mother's care. (Tr. at 348). However, Claimant stated that Cymbalta was helpful in treating her depression and anxiety. (*Id.*). As for her memory loss, Claimant's MMSE was again 30 out of 30. She attributed her issues with concentration and memory to increased stress from her mother's illness. (*Id.*). Claimant was continued on Topamax and Cymbalta. (Tr. at 349).

Claimant saw Ms. Huffman again on February 11, 2013 and was observed napping in the examination room. (Tr. at 378). Claimant stated that her narcolepsy was about the same and identified that her sister-in-law brought her to the appointment, as she was no longer driving due to the condition. (*Id.*). Claimant was continued on Nuvigil and other medications. (Tr. at 378-79).

On April 30, 2013, Claimant saw Dr. Vaught and stated that she continued to do well on Topamax with no migraines "since around Christmas." (Tr. at 350). Claimant reported ongoing family issues over the care of her mother, but believed that her stress and memory loss would improve significantly once the stressors resolved. (*Id.*). Claimant was continued on Cymbalta and Topamax. (Tr. at 351).

On June 3, 2013, Claimant saw Ms. Huffman and Dr. Porterfield regarding narcolepsy with cataplexy. (Tr. at 360). Claimant denied having a headache, memory impairment, or memory changes, but did report depression. (Tr. at 361). On examination, Claimant was noted to be alert with a normal mental status/psychiatric status; however, "sleepiness" was recorded during her neurologic examination. (Tr. at 362). Claimant's cataplexy and narcolepsy was noted to be unstable. (*Id.*). Claimant was continued on her previously prescribed medications. (*Id.*).

On August 29, 2013, Claimant advised Ms. Vaught that she was averaging one headache per month and was pleased with the effectiveness of Topamax. (Tr. at 352). Claimant was continued on Topamax and Cymbalta, as she was doing "very well" on both medications. (Tr. at 353).

At Claimant's four-month follow-up appointment with Ms. Huffman and Dr. Porterfield on October 3, 2013, Claimant denied having a headache, changes in her memory, or a memory impairment. (Tr. at 365). Her cataplexy and narcolepsy were recorded as stable and she was continued on medications. (*Id.*).

Claimant again saw Dr. Porterfield on November 17, 2014 for a six-month follow-up appointment. (Tr. at 443). Although Claimant's dosage of Nuvigil was increased recently, Claimant reported that the medication was "starting to not work." (*Id.*). Claimant's cataplexy and narcolepsy were recorded as unstable. (Tr. at 444). Claimant did not want to take Xyrem due to past issues; thus, the plan was for Claimant to take a break from her narcolepsy medication for one to two days and see if the medication was effective when she resumed taking it. (*Id.*).

### B. Opinion Evidence

On April 23, 2012, Dr. Porterfield wrote a letter in response to questions posed by Claimant's attorney. Dr. Porterfield explained that while narcolepsy symptoms may not completely resolve, they can generally be controlled with medical care or behavioral modification to allow the person to live a relatively normal life. (Tr. at 370). Dr. Porterfield stated that accepted treatment for narcolepsy included scheduled naps, which were often advised for patients in work or school environments. Dr. Porterfield also confirmed that Nuvigil could be used regularly or as-needed, based upon the requirements of the patient. (*Id.*). Therefore, Dr. Porterfield found that Claimant's experimentation with the dosage

and timing of Nuvigil was not unwarranted and was possibly necessary to determine the best treatment for her. (*Id.*). Finally, Dr. Porterfield cautioned that a narcoleptic patient should not be placed in situations that could harm the patient or others, such as driving a bus or truck or otherwise working with dangerous equipment. (*Id.*).

On July 18, 2012, Dr. Porterfield participated in an oral deposition under oath in connection with Claimant's DIB claim. Dr. Porterfield testified that he regularly treated patients with narcolepsy and cataplexy and confirmed that Claimant had both conditions. (Tr. at 427). He explained that narcolepsy is a neurological condition that interferes with the sleep/wake cycle, making it difficult to achieve "good consolidated sleep" or long periods of wakefulness. (Tr. at 428). Cataplexy, Dr. Porterfield explained, is a condition commonly associated with narcolepsy that causes the sudden loss of muscle tone and is usually triggered by a strong emotion. (Tr. at 428-29). Dr. Porterfield stated that narcolepsy patients can have significant daytime sleepiness, which while not entirely impossible to resist, often requires them to take naps. (Tr. at 428). He added that medical literature confirms the use of naps as an integral part of treatment for narcolepsy patients, because naps significantly improve the patients' alertness and daytime functioning. (Tr. at 430). Dr. Porterfield further testified that sometimes naps are by far the best non-pharmacological treatment for narcolepsy. (*Id.*). Dr. Porterfield confirmed that he prescribed naps as part of Claimant's treatment regimen in addition to prescribing the stimulant Nuvigil, which was adjusted during Claimant's treatment. (Tr. at 431-32). In terms of cataplexy, Dr. Porterfield stated that Claimant responded somewhat to the medications that he prescribed, but continued to have occasional episodes. (Tr. at 434).

On January 9, 2014, Ms. Huffman completed a medical source statement noting that Claimant's asthma, cataplexy, and narcolepsy were all stable, and Claimant had no

physical limitations that affected her ability to work. (Tr. at 357). Claimant was noted to have normal musculoskeletal findings and no headaches or other neurological issues. (Tr. at 358).

On January 28, 2014, psychologist Tammie L. Smith, M.A., conducted a clinical interview and mental status examination of Claimant for the West Virginia Disability Determination Service. Claimant stated that her husband drove her to the examination and that she typically did not drive because she was fearful that she would fall asleep and hurt herself and others. (Tr. at 381-82). Claimant reported that her daily activities included making the bed, doing dishes, washing laundry, caring for her personal hygiene, and going outside when it was warm. (Tr. at 385). Claimant also occasionally attended church. (*Id.*).

On February 19, 2014, Rabah Boukhemis, M.D., assessed Claimant's RFC based upon a review of her records. Dr. Boukhemis opined that Claimant could perform a reduced range of light level work, which involved no climbing of ladders, ropes, or scaffolds and no more than occasional postural activities otherwise. (Tr. at 87-88). Also, Dr. Boukhemis found that Claimant should avoid concentrated exposure to temperature extremes and avoid all exposure to hazards. (Tr. at 88-89). Dr. Boukhemis explained that the postural and hazard restrictions were based upon Claimant's narcolepsy and cataplexy. (Tr. at 88). Fulvio Franyutti, M.D., affirmed Dr. Boukhemis' RFC assessment on May 7, 2014. (Tr. at 101-03).

### C. Claimant's Statements

On December 19, 2013, Claimant completed an Adult Function Report in connection with her DIB claim. Claimant stated that she no longer drove because she had fallen asleep at the wheel and "wrecked" due to narcolepsy. (Tr. at 248, 251). Claimant

asserted that even the smallest task caused her pain due to fibromyalgia and that she was exhausted all of the time and had very limited concentration. (Tr. at 248). In a typical day, Claimant reportedly woke up and sipped coffee for a couple of hours, ate cereal, took medicine, made the bed, maybe washed and folded a load of clothing, rested until she ate lunch, maybe swept the floor or dusted, rested until supper, ate dinner, took a bath, took her medications, and went to bed. (Tr. at 249, 251). She did not care for any other people or pets. (*Id.*). Claimant prepared simple meals daily and occasionally prepared a "nicer meal." (Tr. at 250). In terms of social interaction, Claimant visited her parents every week and grocery shopped monthly, but stated that she needed someone to accompany her during those activities. (Tr. at 251-52). Claimant identified that she was able to pay bills, count change, handle a savings account, and use a checkbook and money orders. (Tr. at 251).

Claimant completed another Adult Function Report on April 15, 2014. Claimant again stated that narcolepsy prevented her from driving and that she was almost always exhausted and had trouble concentrating. (Tr. at 294). Her activities remained essentially the same as her prior report. (Tr. at 295-97, 301). However, Claimant noted in this report that she no longer participated in any social activities on a regular basis. (Tr. at 298).

Claimant testified at her administrative hearing on January 12, 2016 that she lived with her husband and seven-year-old granddaughter, who recently moved into their home. (Tr. at 49-50). Claimant noted that her husband was home with her all day. (Tr. at 50). Claimant drove short distances when she felt that she was able to do so safely. (*Id.*). Regarding her alleged onset of disability, Claimant testified that she began experiencing difficulty at work in 2008 and 2009 due to narcolepsy. (Tr. at 40-41). She was working as a business manager for a nursing home and was reportedly so fatigued that she was falling

asleep regularly at her desk despite drinking a pot of coffee per day and additional caffeinated cola beverages to try to stay awake. (Tr. at 40-42). Claimant testified that there were also incidents in which her family did not know where she was at the end of the day and she was discovered asleep at her desk. (Tr. at 42). Claimant stated that by the end of her employment, she was falling asleep at work almost every day. (*Id.*). Claimant was then referred to a narcolepsy specialist, Dr. Porterfield, in 2009 and was treated by him since that time. (*Id.*). Claimant indicated that, as a result of her condition, she did not feel rested after a full night of sleep and had to take a morning nap and an afternoon nap, which totaled four and one-half to five hours of daytime sleep. (Tr. at 43-44). Claimant testified that she generally awoke in the morning at 6:00 a.m., took a three-hour morning nap from approximately 8:00 a.m. to 11:00 a.m., took an afternoon nap from approximately 2:00 p.m. to 3:30 p.m. or 4:00 p.m., and slept for eight to ten hours at night. (*Id.*). Claimant stated that she took a nap every day absent a family emergency or crisis because, if she did not follow her nap schedule, it was comparable to a regular person going without sleep for days. (Tr. at 44). Claimant testified that when she did not nap, she was clumsy, disoriented, and unable to function properly. (Tr. at 44-45). However, Claimant stated that during the periods that she was awake between naps, she was "basically alert" and did reasonably well. (Tr. at 45). Claimant confirmed that her narcolepsy was relatively stable since 2012 with medication adjustments and two naps per day. (Tr. at 46). Claimant stated that she also had secondary issues of cataplexy in which she lost muscle tone in circumstances that she felt strong emotions, depression for which she took Cymbalta, and headaches for which she took Topamax. (Tr. at 48-49). However, Claimant testified that she did not experience episodes of cataplexy every day. (*Id.*).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the United States Court of Appeals for the Fourth Circuit defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    Discussion

### A. Narcolepsy

In her first challenge to the Commissioner's decision, Claimant asserts that the ALJ did not properly consider her need to sleep during the day in assessing her RFC. (ECF No. 9 at 4). Claimant points out that daytime naps were part of her prescribed treatment for narcolepsy, yet the ALJ did not make any finding or provide any analysis as to whether

she needed to sleep during the day. (*Id.*). Claimant explains that the issue of whether she needed to sleep during the day was particularly critical to the ALJ's decision because the vocational expert testified that such a limitation would preclude Claimant from substantial gainful employment. (*Id.* at 5).

Social Security Ruling ("SSR") 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ should assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR § 404.1545(b-d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p,

1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636 (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

Here, the ALJ found at step two of the sequential evaluation that Claimant's only severe impairment was narcolepsy. (Tr. at 25). In assessing Claimant's RFC, the ALJ noted Claimant's alleged fatigue and loss of concentration, as well as her testimony that she needed to take two naps for a total of five hours each day in addition to sleeping up to ten hours at night. (*Id.*). However, the ALJ found that Claimant's allegations as to the intensity, persistence, and limiting effects of her symptoms were not entirely credible for several reasons. (Tr. at 26). Specifically, the ALJ found that Claimant's narcolepsy symptoms were manageable when Claimant was compliant with treatment, which the ALJ felt belied Claimant's allegation that her condition was disabling. (*Id.*). The ALJ further concluded that while Claimant's multiple MSLT results were compatible with her

diagnosis of narcolepsy, the studies did not provide insight into her "day-to-day functional capacity." (*Id.*). The ALJ also stated that "there were no documented clinical observations to corroborate the claimant's allegations of daytime sleepiness, loss of concentration, or poor memory" and her mental status examination findings were normal. (*Id.*). Thus, the ALJ concluded that Claimant's allegations of disabling symptoms were not supported by the clinical signs and findings on examination. (*Id.*). The ALJ also cited other "inconsistencies," which the ALJ found to detract from Claimant's subjective allegations, such as the fact that Claimant stated that she experienced daytime sleepiness and slept excessively when not taking her medication. (*Id.*). The ALJ surmised that such statements implied that Claimant did not experience sleepiness when taking her medication as directed and that her symptoms were manageable when she did take her medication. (*Id.*). The ALJ also found that Claimant attributed her memory and concentration issues to factors other than her narcolepsy and that she made inconsistent statements regarding her daily activities. (Tr. at 27).

Of particular relevance to Claimant's challenge to the ALJ's decision, the ALJ noted the medical source statements from Claimant's treating physician, Dr. Porterfield. The ALJ acknowledged Dr. Porterfield's April 2012 written letter that explained that a 20-to-30 minute nap during the day often significantly helped narcolepsy patients. (Tr. at 27). The ALJ adjudged that such statement was inconsistent with Claimant's allegation that she required a total of five hours of daytime sleep to manage her condition. (*Id.*). The ALJ also cited to Dr. Porterfield's deposition taken in July 2012. (Tr. at 28). However, the ALJ merely remarked that on the issue of whether Claimant complied with her treatment plan for narcolepsy, the ALJ gave more weight to Dr. Porterfield's treatment notes than his statement in the deposition that he did not recall any compliance issues. (*Id.*). The ALJ

emphasized that Dr. Porterfield did not issue any opinion regarding Claimant's functional capacity in his letter or deposition. (Tr. at 27, 28).

Despite the above credibility analysis, the ALJ never assessed whether Claimant needed to sleep during the day and, if so, what were the functional effects of such limitation. Moreover, the ALJ did not provide any support from the record from which the Court could decipher the ALJ's conclusions regarding whether Claimant needed to sleep during the day. It is reasonable to infer from the decision that the ALJ concluded that Claimant did not need to take any naps during the day because the ALJ did not include any associated limitation in Claimant's RFC. However, the ALJ never explicated a finding that Claimant did not need to sleep during the day and the ALJ did not cite to evidence or provide any analysis to that effect. In fact, the ALJ overlooked critical conflicting evidence bearing on this issue. Most importantly, the record contains evidence that Dr. Porterfield not only stated that a daytime nap was a commonly prescribed and effective treatment for narcolepsy patients in general, as cited by the ALJ, but Dr. Porterfield testified that he specifically prescribed daytime naps to Claimant. (Tr. at 430). The ALJ did not address or reconcile this evidence in any way with his ostensible finding that Claimant did not need to sleep during the day. To the extent that the ALJ found that Claimant did not need to take any naps in order to manage her narcolepsy, contrary to her allegations and prescribed treatment, the ALJ was required to explain and support such a conclusion. By comparing Dr. Porterfield's statement that "[o]ften scheduling a short 20-30 minute nap during the day will significantly help narcoleptic symptoms" to Claimant's statement that she needed daytime naps totaling five hours, the ALJ produced some support for a conclusion that Claimant did not need to sleep during the day as much as she alleged. Nevertheless, such comparison provides no support for a conclusion that

Claimant did not need to sleep *at all* during the day in order to manage her condition.

The vocational expert testified at Claimant's administrative hearing that the need to take naps during the day can directly affect an individual's ability to work. Specifically, the expert stated that there are no occupations that accommodate the need to take two naps totaling five hours in a workday. (Tr. at 52). Despite this testimonial evidence, the ALJ did not pose any follow-up questions to the vocational expert, such as any inquiries regarding whether a person requiring a 20-to-30 minute nap, or any lesser or greater degree of daytime sleep, would be capable of working. (*Id.*). Given that the ALJ failed to resolve the question of whether, and for how long, Claimant needed to nap during the day, the Court is unable to confirm that the vocational expert was asked a hypothetical question that fairly incorporated all of Claimant's limitations. *See, e.g., Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016) (remanding a case, in part, because the ALJ "never made specific findings about whether Monroe's apnea or narcolepsy would cause him to experience episodes of loss of consciousness or fatigue necessitating breaks in work and if so, how often these events would occur" and stating that because the ALJ never determined the extent of Monroe's sleep disorders and associated functional limitations, the Court could not determine whether the hypothetical question posed to the vocational expert included all of Monroe's functional limitations). Moreover, without a finding regarding Claimant's need for daytime naps, the ALJ's finding that Claimant is capable of performing her past relevant work is questionable.

While the ALJ may find support in the record for a conclusion that Claimant does not require any daytime naps as a result of her impairment, or that she requires much shorter naps than she alleges, the ALJ's decision fails to articulate any such conclusions and, thus, fails to allow meaningful review of the RFC finding. "Our circuit precedent

makes clear that it is not [the Court's] role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record." *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015). Here, the ALJ explicitly based his decision largely upon his finding that Claimant's narcolepsy symptoms were manageable when Claimant was compliant with treatment, which the ALJ found to belie Claimant's allegation that the condition was disabling. (Tr. at 26). However, both Claimant and Claimant's treating physician testified that naps were an essential component of Claimant's prescribed treatment in addition to the use of medication. Therefore, according to Claimant and her physician, Claimant's narcolepsy only remained stable when Claimant adhered to a nap schedule. Yet, the ALJ did not address or reconcile this information in any way with the ALJ's RFC finding that did not include any limitation related to daytime sleep. In view of the conflicting evidence and the gravity of the issue of daytime sleep on the determination of whether Claimant can work, the ALJ must clearly explain and support a finding regarding Claimant's need to nap during the day. Furthermore, if the ALJ concludes that Claimant requires some amount of daytime sleep, the ALJ must incorporate any associated limitation into the RFC finding, or explain why further restrictions are unnecessary.

Therefore, because the ALJ's RFC discussion lacks a sufficient analysis and explanation for the ALJ's conclusions regarding Claimant's need to sleep during the day related to her narcolepsy and the undersigned cannot conclude that the ALJ's error was harmless, the undersigned **FINDS** that the Commissioner's decision is not supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED** so that the ALJ may reconsider or elaborate on the discussion of Claimant's narcolepsy and any

associated functional limitations.

### B. Headaches

In her next challenge to the Commissioner's decision, Claimant argues that the ALJ did not consider her migraine headaches in assessing her RFC. (ECF No. 9 at 9-10). Upon review of the decision, the undersigned finds that despite Claimant's emphasis on the RFC assessment, the ALJ's error with respect to analyzing Claimant's headaches actually began at step two of the sequential evaluation.

At the second step of the sequential evaluation process, the ALJ determines whether the claimant has an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. § 404.1522(a); SSR 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do physical or mental basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856). Basic work activities include, *inter alia*, capacities for seeing, hearing, speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1522(b). The claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003).

The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as a severe impairment under step

two, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months, 20 C.F.R. § 416.909, and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the sequential process comes to an end. On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54 (1987)); *see also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

In this case, the ALJ found that narcolepsy was Claimant's only impairment that had more than a minimal effect on her ability to do physical or mental basic work activities. (Tr. at 22). The ALJ found Claimant's fibromyalgia and mental disorders to be non-severe impairments. (Tr. at 23). However, the ALJ did not make a single reference to Claimant's headaches in evaluating Claimant's impairments at step two, nor did the ALJ discuss Claimant's headaches at any subsequent step of the sequential evaluation.

Although Claimant did not list headaches as one of her impairments in her initial DIB application, the SSA acknowledged at the reconsideration level of review that Claimant claimed disability due to migraines and other conditions. (Tr. at 125, 241). Indeed, Claimant was diagnosed with and treated for headaches during the relevant period under consideration. In February 2012, Claimant followed up with her primary care provider regarding her diagnosis of headaches. (Tr. at 341). Claimant was prescribed Topamax as a preventive therapy and she additionally used over-the-counter pain

relievers to abort breakthrough headaches, which Claimant stated occurred twice per month despite taking Topamax. (*Id.*). Claimant reported memory and concentration issues, which her treating provider thought were possibly attributed to her use of Topamax. (*Id.*). Thus, Claimant's prescription for Topamax was temporarily discontinued and replaced with another medication. (Tr. at 342). However, at Claimant's next appointment in June 2012, Claimant stated that discontinuing Topamax did not improve her memory, but significantly worsened her headaches. (Tr. at 343). Claimant stated that since she stopped taking Topamax, she was suffering migraines twice per week with sensitivity to light, sound, and smell, as well as difficulty with nausea and vomiting. (*Id.*). She stated that Tylenol eased, but did not completely relieve her headaches, and she usually had to sleep to completely resolve the headaches. (*Id.*). Claimant was again prescribed Topamax and the dosage was increased. (Tr. at 344). Claimant's physician opined that Claimant's memory difficulty was likely due to increased stress and anxiety, but referred Claimant for neuropsychological testing. (*Id.*). Claimant was later noted to be doing well with a significant decrease in migraines in January 2013 and April 2013. (Tr. At 348-50). Claimant continued to take Topamax twice daily to prevent headaches and took Excedrin Migraine as an effective abortive therapy. (*Id.*). Claimant canceled her neuropsychological testing because Cymbalta was "helpful regarding her questionable memory loss." (Tr. at 346). In August 2013, Claimant stated that she was averaging one headache per month and was pleased with the effectiveness of Topamax. (Tr. at 352).

Based upon the above, although the record might provide support that Claimant's headaches were a non-severe impairment, there was sufficient evidence to warrant an analysis of this impairment by the ALJ at step two of the sequential evaluation. *See, e.g., Moss v. Berryhill*, No. 2:16-CV-05016, 2017 WL 4296637, at *17 (S.D.W. Va. Apr. 27,

2017), *report and recommendation adopted,* 2017 WL 4294206 (S.D.W. Va. Sept. 27, 2017) ("Considering that Claimant had a documented diagnosis of syringomyelia and received treatment for symptoms associated with that condition, the ALJ erred by not addressing its severity at step two.").

Nevertheless, an error in not addressing a claimant's impairment at step two of the analysis can be considered a harmless error if the ALJ considered any functional effects of the impairment at the later steps of the process. *Moss*, 2017 WL 4296637, at *17 (discussing that a failure at step two may not require remand if the determination proceeds to subsequent steps and any functional effects of the impairment are considered in formulating the RFC). However, the undersigned cannot conclude that the ALJ's unequivocal failure to consider Claimant's headaches anywhere in the decision can be considered a harmless error in this circumstance. As shown above, Claimant was diagnosed with headaches and treated for them with Topamax throughout the relevant period. She continued to complain of some breakthrough headaches, as well as some potential side effects of her medication, such as memory loss and difficulty concentrating. Yet, despite this evidence, the ALJ did not provide any indication that he considered the effects of Claimant's headaches in the pain and credibility analysis or that he considered whether Claimant's headaches imposed any functional limitations alone or in combination with Claimant's other impairments. *See, e.g., Hewlett v. Berryhill*, No. 1:16-cv-1443, 2018 WL 836050, at *5 (M.D.N.C. Feb. 12, 2018) ("The ALJ's failure to identify Plaintiff's lower back pain as a 'severe' impairment at step two of the evaluation process is not harmless, since the relevant medical evidence was not addressed at any point in the evaluation process, and thus remains completely unaddressed. Indeed, even if Plaintiff's low back pain would alone be considered "non-severe," any resulting limitations should

still have been addressed in some way in formulating the RFC.") (citing Social Security Ruling 96–8p, 1996 WL 374184, at *5 ("[I]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim.").

While it is certainly possible that the ALJ might conclude that consideration of Claimant's headaches does not alter the RFC assessment or ultimate decision, the undersigned cannot state with any reasonable degree of certainty that consideration of Claimant's headaches would have no conceivable effect on the outcome. Moreover, the Court cannot substitute its analysis for that of the ALJ when the ALJ has failed to provide any reference to or analysis of Claimant's headaches in the decision. Therefore, for the above reasons, the undersigned **RECOMMENDS** that this matter be remanded on the additional basis that the ALJ should reconsider or elaborate on the discussion of Claimant's headaches and any associated functional limitations.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF Nos. 9), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 10); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further

administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** July 27, 2018

Cheryl A. Eifert
United States Magistrate Judge